**NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant,**

v.

**STATE FARM AUTOMOBILE INSURANCE COMPANY, Appellee.**

No. 96–SC–558–DG.

Supreme Court of Kentucky.

May 21, 1998.

Rehearing Denied Sept. 3, 1998.

Edward H. Bartenstein, MacKenzie & Peden, P.S.C., Louisville, for Appellant.

Edmund P. Karem, Sitlinger, McGlincy, Steiner, Theiler & Karem, Louisville, for Appellee.

STUMBO, Justice.

This case presents an issue that is an extension of the doctrine requiring an underinsured motorist insurance carrier, in order to preserve its subrogation right, to substitute its payment for that of the liability

carrier for the settling tortfeasor. *See, Coots v.. Allstate Ins. Co.,* Ky., 853 S.W.2d 895 (1993). Here, the underinsured motorist carrier (UIM), Nationwide Mutual Insurance Company (hereinafter "Nationwide"), substituted its $50,000 for the same amount offered in settlement by the liability carrier, State Farm Automobile Insurance Company (hereinafter "State Farm"). When the case was submitted to the jury, it awarded only $26,683 in damages. Of this $26,638, Nationwide was statutorily liable for $10,000 in basic reparation benefits (BRB) under the Motor Vehicle Reparations Act (MVRA). *See* KRS 304.39–020(2); KRS 304.39–040(1). Nationwide sought to recover $50,000, the entire amount of its substitution, from State Farm, but instead was allowed only the amount awarded by the jury in excess of Nationwide's BRB liability—$16,683. The Court of Appeals affirmed and we accepted discretionary review.

■ The Court of Appeals framed the question presented as follows: "Who bears the risk of overpayment between the plaintiff's underinsured motorist carrier and the tortfeasor's liability carrier, when the plaintiff's underinsured motorist carrier has substituted payment of a proposed settlement to protect its subrogation rights and a jury awards the plaintiff less than the amount of the proposed settlement?"

Nationwide argues that it has been unfairly penalized in making the substitution as required to preserve its subrogation rights, because it had no liability at all in this case, a fact that could not be determined until the litigation of damages was complete. Nationwide's argument is two-fold: It was not Nationwide who valued this claim at $50,000; rather, it was State Farm who made that determination, thus forcing Nationwide to advance the funds to preserve its contractual right of subrogation. To deny Nationwide the recovery of the money advanced is to punish Nationwide for exercising its right pursuant to contract. To deny the right to seek subrogation when no substitution is made is also to deny Nationwide its right to litigate whether UIM benefits are due at all.

The basis for requiring the substitution of payment is explained in *Coots v. Allstate Ins.*

*Co.,* Ky., 853 S.W.2d 895, 901 (1993), where it is noted that:

[T]he subrogation right cannot be absolute because in some instances it is inimical to the right of the UIM insured to settle with the tortfeasor and his liability insurer for the policy limits. This is so because, before making such payment of the policy limits the tortfeasor's insurer will routinely demand, as was done in the present cases, full release and indemnification against future claims against the tortfeasor by the UIM carrier. Indeed the liability carrier's obligation to its own insured to defend in good faith requires that it extract such a release rather than leave its own insured unprotected. . . .

. . . .

If UIM coverage is to accomplish its remedial purpose as intended by the MVRA, the UIM carrier's contractual subrogation right must not obstruct the UIM insured's right to settle for the policy limits even if it means releasing subrogation.

Here, the right of the insured to settle was not interfered with, indeed, it was facilitated by the substitution of the payment by the UIM carrier. It was only when the matter went to trial that the actual amount of the liability due the injured party was determined and the "overpayment" discovered.

In reaching its decision affirming the judgment of the trial court, the Court of Appeals noted that the system set up by the *Coots* decision accomplishes the remedial purposes of the MVRA in that the plaintiff can receive the amount of the tortfeasor's policy limits, either from the liability carrier or from the UIM carrier without having to obtain a judgment. The tortfeasor has an incentive to settle, in that he may obtain a release from further liability, and the tortfeasor's liability carrier protects itself from a bad faith action by making the offer for policy limits. The plaintiff can then proceed against the UIM carrier and the UIM carrier can preserve its right of subrogation.

In holding that it is the UIM carrier that should bear the risk of overpaying the plaintiff, the Court of Appeals stated that doing so encourages the UIM carrier to make an in-

formed decision as to whether its subrogation rights are valuable or simply illusory. Since UIM benefits are payable only when the tortfeasor's liability exceeds the tortfeasor's policy limits, the UIM carrier must determine the value of the plaintiff's claim and the value of the potential subrogation claim when the liability carrier has offered the policy limits. The UIM carrier must determine, before it substitutes payment, the strength of the plaintiff's claim, the extent of the plaintiff's damages and the likelihood of being reimbursed by the tortfeasor for UIM benefits. It is appropriate that these matters be fully examined by the UIM carrier before it interferes with a settlement, and it should do so only when it finds those subrogation rights to be truly valuable.

As correctly noted by the Court of Appeals, a substitution by the UIM of the amount offered in settlement does not truly result in a settlement. The tortfeasor remains in a position of potential liability should the judgment exceed the amount of his policy limits. Further should the tortfeasor refuse to settle, instead going to trial, the jury could absolve him or her of liability or adjudge the liability to be less than the policy limits. Thus, if the UIM carrier can substitute payment without any risk, then the tortfeasor may be in a better position if he does not make a settlement offer at all to the plaintiff. With the risk of a bad decision on the UIM carrier, the UIM carrier is forced to make an informed decision and a realistic assessment of the offer. Further, it promotes finality between the plaintiff and the tortfeasor when the UIM carrier decides that its subrogation right has no value. Finally, the Court of Appeals concluded that placing the risk of loss on the UIM carrier also simplified the determination of UIM coverage. Once the issue of liability is decided, the only question remaining is the amount of damages. Hence the time and expense of the subsequent proceedings will also be reduced.

■ When analyzed, it is clear that the Court of Appeals decided that the UIM carrier must determine its own destiny: if it chooses to substitute payment based on the risk evaluation of the liability carrier, it is bound by that assessment when the time to assert its subrogation rights arrives. We believe that this appraisal of the policy arguments behind the decision rendered by the lower court is both accurate and logical.

Nationwide contends, without citation to any authority, that because Sate Farm evaluated the claim and offered the policy limits settlement, State Farm should be the one to pay the settlement amount. This argument has some superficial appeal, but does not take into account the non-financial factors that a liability carrier must consider in arriving at a settlement figure. While the UIM carrier can focus primarily on the actual damages suffered by the injured party, who is after all the UIM's insured, and whether its own coverage is likely to be called upon, the liability carrier must keep in mind its obligation to vigorously defend the tortfeasor without exposing its client to potential personal liability. Factors such as whether the tortfeasor is likely to be found liable, the ability of the tortfeasor to testify and whether he or she will make a good witness as opposed to the sympathy the injured party could evoke in a jury, and the extent of the tortfeasor's personal property and other obligations which could be at risk if a trial ensues, are all pertinent to the liability carrier's decision whether to settle. Thus, the liability carrier's decision to make an offer does not depend solely on the economic factor of provable damages.

While the UIM carrier will also consider the same factors in evaluating the settlement offer of the liability carrier, it has the cushion of subrogation if it decides to substitute payment, as well as the certainty of knowing that there will have to be a substantial award before its own money is at risk. Again, each insurance carrier has an independent responsibility and duty to its own insured. The factors considered by each in evaluating a settlement figure may be similar, but the function of the insurance coverage is different and what may be a reasonable settlement for one carrier will be unreasonable for the other.

Nationwide has also argued that there is a violation of its due-process rights under both the Kentucky and United States Constitu-

tions, as well as its right to free access to the courts guaranteed by Section 14 of the Kentucky Constitution. We decline to address these Constitutional issues, however, since it appears that they were not properly preserved in either the trial court or the Court of Appeals and, thus, are not preserved for our review.

For the reasons set forth in this opinion, we hereby affirm the decision of the Court of Appeals.

JOHNSTONE, LAMBERT, and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion, in which STEPHENS, C.J., and GRAVES, J., join.

COOPER, Justice, dissenting.

If not qualified as a self-insurer, every owner of a motor vehicle in Kentucky is required to provide tort liability insurance coverage for that vehicle with minimum limits established by KRS 304 .39–110(1). KRS 304.39–010(1); KRS 304.39–080(5). Under the liability coverage provisions of the owner's policy, the insurer agrees to pay, up to the maximum limits of the coverage purchased, any damages caused to another because of the negligence of the owner or anyone operating the insured vehicle with the owner's permission. Additionally, an owner of a motor vehicle in Kentucky *may* purchase underinsured motorist (UIM) coverage by which the insurer agrees to pay, up to the maximum limits of the coverage purchased, any damages incurred by the owner as a result of the negligence of the operator of another vehicle, to the extent that such damages exceed the maximum limits of liability coverage provided for the other vehicle. KRS 304.39–320(2). Conceptually, the UIM statute affords an insured the right to purchase additional liability coverage for the vehicle of a prospective underinsured tortfeasor. *LaFrange v. United Serv. Auto. Ass'n,* Ky., 700 S.W.2d 411, 414 (1985). KRS 304.39–320(2) specifically provides that UIM coverage applies only to the extent that "the judgment recovered against the owner of the other vehicle exceeds the liability policy limits thereon." Thus, the tortfeasor's liability coverage is primarily liable for the injured party's damages, and the injured party's UIM coverage is payable only if those damages exceed the limits of the tortfeasor's liability coverage.

As originally enacted, KRS 304.39–320(2) contained the following provision:

> His [the UIM insured's] insurance company shall be subrogated to any amount it so pays, and upon payment shall have an assignment of the judgment against the other party to the extent of the money it pays.

That sentence was deleted in 1990. 1990 Ky.Acts, ch. 103, 2. However, it was held in *Coots v. Allstate Ins. Co.,* Ky., 853 S.W.2d 895, 901 (1993) that the UIM carrier retained its contractual and common law subrogation claim for indemnity against the tortfeasor whose negligence had exposed it to liability for damages sustained by its insured. *See Brown Hotel Co. v. Pittsburgh Fuel Co.,* 311 Ky. 396, 224 S.W.2d 165, 168 (1949).

*Coots* also held that the injured party was not required to obtain a judgment against the tortfeasor in order to preserve a claim against the UIM coverage of his own policy. He could negotiate a policy limits settlement with the tortfeasor without abrogating the UIM coverage, so long as he notified the UIM carrier of his intent to do so and "provided the carrier an opportunity to protect its subrogation rights." *Id.* at 900, *overruling Kentucky Central Ins. Co. v. Kempf,* Ky.App., 813 S.W.2d 829 (1991). Of course, the carrier's subrogation rights needed no protection. "The common law right of indemnity is a jural right which existed prior to the adoption of our Constitution and may not be abolished. . . ." *Kentucky Util. Co. v. Jackson County R.E.C.C.,* Ky., 438 S.W.2d 788, 790 (1968). Nor can it be impaired. *Williams v. Wilson,* Ky., 972 S.W.2d 260, 261 (1998). Nevertheless, it was held in *Coots* that in order to protect its jural right of indemnity, the UIM carrier must substitute its own money for the amount offered in settlement to its insured by the tortfeasor's liability insurer. Thus, if the tortfeasor had one million dollars of liability coverage and the injured party had $50,000 of UIM cover-

age, and if the liability carrier for the tortfeasor offered its policy limits in settlement, the UIM carrier would be required to pay one million dollars of its own money in substitution for a proposed settlement, which it did not owe, in order to protect its jural right of indemnity in the event it was subsequently required to pay its $50,000 UIM coverage. Such a requirement would seem to substantially impair the UIM carrier's jural right of indemnity.

Of course, *Coots* was not concerned about the jural rights of UIM carriers. It was concerned with designing a procedure by which an injured party in a tort action could receive the settlement amount offered by the tortfeasor's liability insurer and still retain his UIM claim against his own insurer. (The liability carrier's settlement offer necessarily would be conditioned upon receipt of a release and indemnity agreement in favor of its insured, the tortfeasor. *Coots, supra,* at 901. However, execution of such an agreement would require the injured party to indemnify the tortfeasor for any amounts which the tortfeasor subsequently might have to pay to indemnify the UIM carrier, thus effectively abrogating the UIM claim. The substitution procedure allows the injured party to pocket the settlement offer without executing a release and indemnification agreement.) However, *Coots* did contemplate that the UIM carrier ultimately would recoup the substituted payment.

> [T]he underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement. In this situation, *the underinsurer's payment would protect its subrogation rights to the extent of the payment* and the insured would receive the amount of the settlement offered in cash.

*Id.* at 902, *quoting, Schmidt v. Clothier,* 338 N.W.2d 256, 263 (Minn.1983) (emphasis added). Thus, the UIM carrier ultimately would be indemnified by the tortfeasor (through his liability carrier) to the extent of the substituted payment. Both logic and law support this result.

Logic requires that the liability carrier ultimately pay the settlement for which its coverage is primarily liable and which it was willing to pay in the first place. By making the offer of settlement, the liability carrier obtained the additional benefit of eliminating any possible claim premised upon "bad faith." *See State Farm Mut. Auto. Ins. Co. v. Reeder,* Ky., 763 S.W.2d 116 (1988); *Manchester Ins. & Indem. Co. v. Grundy,* Ky., 531 S.W.2d 493 (1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976). Although the Coots procedure leaves the tortfeasor unprotected against potential liability for the UIM carrier's subrogation claim for indemnity, that is the same position he would have been in without *Coots,* assuming the UIM carrier declined to waive its right to indemnity. And, of course, the tortfeasor is no worse off than he would have been if the plaintiff had not purchased UIM coverage. In that event, the tortfeasor would have been personally liable to the plaintiff for any judgment in excess of the limits of his liability coverage. Even *Schmidt v. Clothier, supra,* the precedent relied on in *Coots* for the substitution procedure, holds that, as between the UIM carrier and the underinsured tortfeasor, the equities balance in favor of the UIM carrier. 338 N.W.2d at 262–63.

The law in this Commonwealth has always been that a party who involuntarily pays the debt of another has a cause of action to recover that payment from the debtor. *E.g., Armstrong's Adm'r v. Keith,* 26 Ky. (3 J.J. Marsh.) 153 (1830). One who pays such a debt in order to protect his own security or legal right does not act voluntarily. *Cf. C.I.T. Corp. v. Studebaker Sales of Kentucky,* 251 Ky. 349, 65 S.W.2d 84, 86 (1933). When the UIM insurer is forced to protect its jural right of indemnity by advancing its money to pay a settlement offer made by the tortfeasor's liability insurer, such payment can hardly be viewed as voluntary. Nor is it arguable that State Farm's offer to settle for $50,000 was not enforceable. The offer was never withdrawn and the plaintiff clearly accepted it; otherwise, there would have been no need for Nationwide to substitute its money for the settlement. Whether denominated as the ancient action in assumpsit, an action for restitution of money paid, or an implied contract premised upon unjust enrichment, the UIM carrier is entitled to indemnity from

the liability carrier for its substituted payment.

Nevertheless, with no citation to any authority except *Coots, supra,* the majority of this Court today holds that Nationwide, which was forced by *Coots* to pay money which it did not owe in order to protect its jural right of indemnity, cannot recoup that payment simply because the jury determined that the plaintiff was entitled to less money than State Farm was willing to pay to settle her case. This result allows the liability insurer to shift the risk of a jury verdict against its insured from its own coverage to the UIM carrier. If the verdict exceeds its policy limits, the liability insurer loses nothing more than it was willing to pay in settlement and avoids any possible "bad faith" claim. If the verdict is less than its policy limits, the liability carrier pays only the verdict and the UIM carrier, which otherwise would owe nothing, is required to pay the difference between the verdict and the liability carrier's settlement offer. This unjust and inequitable result was never intended by *Coots* and is contrary to two centuries of Kentucky common law with respect to the issues of indemnity and restitution.

For these reasons, I respectfully dissent and would reverse and remand this case to the Shelby Circuit Court with directions that Nationwide be permitted to file its amended complaint and that it be awarded judgment against State Farm in the sum of $60,000.00, representing the $50,000.00 reimbursement of its substituted payment of State Farm's settlement offer, plus $10,000.00 reimbursement for basic reparation benefits paid to its insured. KRS 304.39–070(3); *Ohio Sec. Ins. Co. v. Drury,* Ky.App., 582 S.W.2d 64 (1979).

STEPHENS, C.J., and GRAVES, J., join this dissenting opinion.